**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

RASHEDAH HENDERSON,

               Plaintiff,

     v.

UNITED PARCEL SERVICE,

               Defendant.

1:17-cv-13059-NLH-KMW

**OPINION**

**APPEARANCES:**

SARAH R. LAVELLE
COMEAU & BUNKER
1600 JOHN F. KENNEDY BOULEVARD
FOUR PENN CENTER, SUITE 500
PHILADELPHIA, PENNSYLVANIA 19103

DAVID MIKEL KOLLER
KOLLER LAW PC
2043 LOCUST STREET, SUITE 1B
PHILADELPHIA, PENNSYLVANIA 19103

     *On behalf of Plaintiff*

JOSEPH C. DEBLASIO
JACKSON LEWIS P.C.
766 SHREWSBURY AVENUE
TINTON FALLS, NEW JERSEY 07724

LUKE P. BRESLIN
JACKSON LEWIS P.C.
200 CONNELL DRIVE, SUITE 2000
BERKELEY HEIGHTS, NEW JERSEY 07922

     *On behalf of Defendant*

**HILLMAN**, District Judge

Plaintiff Rashedah Henderson filed this suit against Defendant United Parcel Service ("UPS") alleging violations of Title VII of the Civil Rights Act ("Title VII") and the New Jersey Law Against Discrimination ("NJLAD"). [Docket No. 1.] UPS subsequently filed a Motion for Summary Judgment. [Docket No. 27.] For the reasons expressed below, UPS's Motion will be granted in full.

### BACKGROUND[1]

Ms. Henderson was hired by UPS as an Administrative Assistant on or about May 8, 2006. She worked in various part-time roles until February 2014, when she took a full-time position as a Security Specialist. In that role, she worked at a UPS facility on Oregon Avenue in Philadelphia, Pennsylvania, as well as one at the Philadelphia Airport. At that time, Larry Gaines — the man whose workplace actions led to this suit — was

---

[1] The Court distills this undisputed version of events from the parties' statements of material facts, affidavits, and exhibits, and recounts them in the manner most favorable to the party opposing summary judgment — here, Plaintiff. The Court disregards, as it must, those portions of the parties' statements of material facts that lack citation to relevant record evidence (unless admitted by the opponent), contain improper legal argument or conclusions, or recite factual irrelevancies. See generally L. CIV. R. 56.1(a); see also Kemly v. Werner Co., 151 F. Supp. 3d. 496, 499 n.2 (D.N.J. 2015) (disregarding portions of the parties' statements of material facts on these grounds); Jones v. Sanko Steamship Co., Ltd., 148 F. Supp. 3d 374, 379 n.9 (D.N.J. 2015) (same).

a Security Supervisor.  On or about September 22, 2014,
Henderson was promoted to a Security Supervisor position solely
at the Oregon Avenue facility.  Upon this promotion, Henderson
and Gaines were peers.

In April 2015, Gaines was promoted to Security Manager, at
which point Henderson began reporting to him.  As a Security
Manager, Gaines had security-related responsibility for three
UPS facilities: a building in Lawnside, New Jersey; a facility
at the Philadelphia Airport; and the Oregon Avenue building
where Henderson worked.  Gaines' supervisor was Aron Meeks, the
Chesapeake District Security Director.

Initially, Henderson and Gaines had a good working
relationship.  But that changed in April 2015, when Gaines made
the first of three comments that Henderson believed were
inappropriate and created a hostile work environment.  Namely,
Henderson testified that she and Gaines were walking through the
Oregon Avenue building when they saw an attractive woman and
Gaines said to Henderson, "I think you're a bisexual."  He said
nothing more, and Henderson walked away.  The next day, Gaines
approached Henderson, apologized for the comment and asked if
they could get past it.  Henderson says that they did move past
it at that point, and that Gaines never said anything about her
sexuality to him again.

But then in December 2015, about eight months later, the two were at the UPS facility in the Philadelphia Airport when Gaines allegedly said, "I would consider us both attractive people; wouldn't you say?"  And in January 2016, this time at the Oregon Avenue location, another incident occurred.  Gaines and Henderson were walking through the building and came upon a coworker named Steve Keenan.  He allegedly made a joke about the fact that Gaines was a married man, to which Gaines responded by saying to Keenan, "Steve, that was below the belt.  You get it?  Below the belt."  When he made that comment, Gaines allegedly "started to thrust his pelvic area."  Henderson witnessed this gesture.

Henderson concedes that the above three incidents are the only instances of alleged sexual harassment in this case.  Aside from those three comments and the gesture, Gaines never said or did anything that Henderson considered to be a sexual advance.  Moreover, Henderson admits that Gaines' alleged comments and conduct did not interfere with her job performance and that there was never any criticism of her performance as a Security Supervisor.

Shortly after the third incident, still in January 2016, Henderson called her former supervisor, Ricky Rau, and told him about Gaines' "below the belt" comment.  This was the first time that she complained to anybody about any of the above incidents.

4

Rau suggested that Henderson contact Meeks, Gaines' supervisor. Henderson did just that, at which point Meeks arranged for her to meet with Area Human Resources Manager Larry Moulder.

Moulder met with Henderson and conducted an investigation based on what she had reported.  Moulder interviewed Gaines and Keenan.  Gaines denied saying or doing anything inappropriate while Keenan confirmed that he had made some comment about Gaines being a married man but could not hear Gaines' response. Keenan did recall that Gaines had gestured to his waist and knees, but Keenan did not believe that was a sexual gesture.  At the conclusion of Moulder's investigation, Gaines was counseled about UPS's Professional Conduct and Anti-Harassment Policy, warned that any form of sexual harassment would not be tolerated, and warned not to retaliate against Henderson in any way for having raised concerns.  Finally, Gaines was required to read and sign the Professional Conduct and Anti-Harassment Policy, as well as a No Retaliation statement, which confirmed that he agreed not to engage in any form of sexual harassment or retaliation.  Henderson concedes that Gaines never did or said anything that she considered to be sexual harassment after this point.

After the above transpired, Henderson generally refused to talk with Gaines and insisted that any communication be limited to emails or text messages.  But on April 28, 2016, Henderson

and Gaines had a meeting to discuss her career development. Henderson alleges that, in that meeting, Gaines told her that she "was committing career suicide for reporting" him. That meeting was the last substantive conversation between the two of them. All further communications were in writing.

Four months after the alleged "career suicide" comment, on September 9, 2016, Henderson met with Meeks and Moulder to discuss her working relationship with Gaines. In that meeting, Henderson for the first time reported the "career suicide" comment. Moulder confronted Gaines about this and Gaines emphatically denied making any such comment or treating Henderson differently based on the concerns that she had previously raised about him. Moulder also informed Eddie Roach, the District Human Resources Manager, of the issues that Henderson had raised.

In response, Roach and Henderson met to address her concerns on September 13, 2016. In that meeting, Roach asked Henderson what he and UPS could do to make her more comfortable and happier at UPS. In the moment, Henderson did not have any suggestions, so Roach gave her his phone number, invited her to call him at any time, reminded her of UPS's open-door policy, and asked her to follow up with suggestions on how he and UPS could address her concerns.

About a week later, on September 21, 2016, Henderson suggested to Roach that she be transferred out of the Security Department.  Roach offered her the opportunity to transfer to a supervisor position in either the Feeder Department (UPS's tractor-trailer operation) or a position as an On-Road Supervisor, supervising package delivery drivers in one of the package delivery centers.  Ms. Henderson requested an On-Road Supervisor position, and her request was granted.

In November 2016, she transferred out of the Security Department and into the package delivery operation in Lawnside, New Jersey.  Prior to this point, her employment and alleged instances of harassment all occurred exclusively in Pennsylvania.  This was a promotion for her, in that it resulted in a raise from $65,000 to $80,000, and later to $89,000.  It also gave her additional responsibilities, including training and supervising approximately sixty package delivery drivers. She performed these duties mostly on the road, but she would also sometimes work at the Lawnside facility.  Upon receiving this promotion, she no longer reported to Gaines and was not in his chain of command.

From approximately November 2016 to March 2017, Henderson then completed training for the On-Road Supervisor position. Such training was required because she had no previous experience working in the package delivery operation.  As part

of the training, she worked as a delivery driver in the Lawnside facility for approximately four months.  This is standard practice for somebody who is going to become an On-Road Supervisor.  Kathryn Gardiner, a female On-Road Supervisor, was responsible for training and supervising Henderson as a package delivery driver.  Although Henderson asserts Gardiner was a poor trainer, she admits that Gardiner in no way discriminated or retaliated against her.  Moreover, Henderson was never disciplined during her training period, and she was paid her normal wages during that time.

It is undisputed that during her training Henderson was required to deliver packages in a U-Haul vehicle, rather than a UPS vehicle, during this training period.  Henderson argues that this slowed her performance and resulted in her having to go through additional training.  She further alleges that such a requirement is not "common practice" at UPS.  The parties agree, though, that Henderson's training took place during what she described as the "thick of peak season."  During that high-volume time-frame, UPS used approximately 20 rental vehicles, in addition to its typical flight of UPS vehicles, to meet demand.

Additionally, Henderson claims that two other employees, Dennis Doyle and Jason Abette, were allowed to start as On-Road Supervisors without first having to work as a driver.  These are the only two employees that she argues were treated differently.

UPS admits that Doyle was training for a Package Dispatch Supervisor position, not an On-Road Supervisor position.  He was initially required to spend time working as a package car driver during his training, before which he had to attend driver training classes.  However, before he completed those classes, he was pulled out of them and put on the road as a package car driver due to demand.  As soon as Roach learned about this, Doyle was pulled off the road and required to complete the remaining classes.  The parties do not address the validity of Henderson's allegations with respect to Abette.

After Henderson's transfer and promotion in November 2016, she and Gaines occasionally saw each other because he still had security responsibilities and an office at the Lawnside location.  The Lawnside location had an employee parking lot in which hundreds of UPS employees parked. In May 2017, six months after Henderson started at the Lawnside location, Henderson noticed for the first time that Gaines' car was parked near her car in the employee lot.  Over the course of the next two months, Henderson claims that Gaines' car was parked near — though never next to — her car on twelve occasions.  Henderson only ever saw Gaines once during that time period, and neither of them said anything to each other.  The only evidence Henderson had to suggest that this parking routine was an intimidation or retaliation tactic employed by Gaines was the

9

fact that he had previously told her that he did not like parking in that lot. Nevertheless, after the one occasion in which Henderson saw Gaines in the lot, she reported to Quinn, the Human Resources Manager, that Gaines' car sometimes was parked near her car. After that, she never again saw Gaines' car parked near her car.

As of the filing of the present motion, Henderson was still an On-Road Supervisor. She admits to having never been disciplined or subject to any adverse employment action. She does not claim that anybody other than Gaines created a hostile work environment for her. She admits that Gaines never physically touched her. Additionally, UPS has well-publicized policies prohibiting discrimination, sexual harassment, and unprofessional conduct in the workplace. UPS's stated policies are to promptly investigate employee concerns and, where a violation of the policy is found, to take action against the employee who violated the policy. Such action can include termination or other disciplinary action. Henderson was aware of these policies and admits that they were reinforced with her and other employees on a regular basis.

## PROCEDURAL HISTORY

On August 25, 2016, Henderson filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). She was represented by counsel at that point. The

Charge asserted a hostile work environment claim based on sexual harassment by Gaines and retaliation for complaining of the sexual harassment.  The EEOC was unable to conclude that the information in the Charge established violations of the relevant statutes.  On December 13, 2017, Henderson filed her six-count Complaint.  [Docket No. 1.]  Counts I and II allege gender discrimination in violation of Title VII and the NJLAD, respectively.  Counts III and IV allege sexual harassment in the form of hostile work environment in violation of Title VII and the NJLAD, respectively.  Finally, Counts V and VI allege retaliation in violation of Title VII and the NJLAD.

UPS answered the Complaint on April 27, 2018.  [Docket No. 4.]  After the parties engaged in discovery, UPS filed the present Motion for Summary Judgment on June 28, 2019.  [Docket No. 26.]  It amended its brief on July 1, 2019.  [Docket No. 27.]  Henderson filed her response on July 16, 2019.  [Docket No. 28.]  UPS filed is Reply on July 29, 2019.  [Docket No. 29.]

### JURISDICTION

The Court exercises subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claim arises under the laws of the United States.  Specifically, Henderson alleges violations of Title VII.  The Court exercises supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Henderson's state law claims because they arise out of the same

circumstances and are based on a common nucleus of operative facts.

## **STANDARD OF REVIEW**

Summary judgment will be granted if "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any,' . . . demonstrate the absence of a genuine issue of material fact" and the party seeking summary judgment is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (citing FED. R. CIV. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marion v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004).

The moving party first bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323 ("[A] party seeking summary judgment always bears

12

the initial responsibility of informing the district court of
the basis for its motion, and identifying those portions of 'the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any,' which
it believes demonstrate the absence of a genuine issue of
material fact.").  The moving party may discharge that burden by
"'pointing out to the district court[ ]that there is an absence
of evidence to support the nonmoving party's case' when the
nonmoving party bears the ultimate burden of proof." Singletary
v. Pa. Dep't of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001)
(quoting Celotex, 477 U.S. at 325).

     Once the moving party has met this burden, the nonmoving
party must identify specific facts showing that a genuine issue
for trial exists.  Celotex, 477 U.S. at 324.  The party "may not
rest upon the mere allegations or denials of the . . .
pleading[s]," but instead must rely on affidavits or other
documents.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir.
2001).  To withstand summary judgment, the nonmoving party "must
'make a showing sufficient to establish the existence of [every]
element essential to that party's case, and on which that party
will bear the burden of proof at trial.'" Cooper v. Sniezek,
418 F. App'x 56, 58 (3d Cir. 2011) (quoting Celotex, 477 U.S. at
322).  Therefore, to prevail in opposition of a motion for
summary judgment, the nonmoving party must identify specific

13

facts and affirmative pieces of evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 257.

## DISCUSSION

The Complaint in this matter raises six claims: two allege gender discrimination, two allege sexual harassment in the form of hostile work environment, and two allege retaliation.  UPS argues that it is entitled to summary judgment on all six counts.  The Court will first address the retaliation and gender discrimination claims because they both fail for the same reason.  The Court will then address the hostile work environment claim.

### A.   Retaliation and Gender Discrimination

Counts I and II allege disparate treatment gender discrimination under Title VII and the NJLAD, respectively. Counts V and VI allege retaliation under the same statutes, respectively.  The analysis of claims under those two statutes are the same: the burden-shifting framework established in McDonnell Douglas Corp. v. Green. 411 U.S. 792 (1973); see Davis v. City of Newark, 285 F. App'x 899, 903 (3d Cir. 2008) ("Discrimination claims brought under Title VII and NJLAD must be analyzed according to the burden-shifting framework set forth by the Supreme Court in [McDonnell Douglas]."); Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001) (listing the same elements for retaliation under Title VII and the NJLAD).

14

Under that framework, the plaintiff has the initial burden of establishing a prima facie case under the relevant statute. McDonnell Douglas, 411 U.S. at 802; see also Parikh v. UPS, 491 F. App'x 303, 307 (3d Cir. 2012) ("[P]laintiff must establish a prima facie case of discrimination."). This requires the plaintiff to produce sufficient evidence to allow the factfinder to infer the fact at issue. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 254 n.7 (1981). For both retaliation and gender discrimination, one requirement of the prima facie case is that the plaintiff suffered an adverse employment action. Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005) (retaliation); Rosencrans v. Quixote Enters., 755 F. App'x 139, 142 (3d Cir. 2018) (gender discrimination) (non-precedential) (citing Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008)).[2]

---

[2] To establish a prima facie case of gender discrimination under a disparate treatment theory, a plaintiff "must show that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of intentional discrimination." Rosencrans, 755 F. App'x at 142 (non-precedential) (citing Makky, 541 F.3d at 214). To establish a retaliation claim, a plaintiff must show that: (1) she engaged in protected activity; (2) the employer took an adverse employment action against her either subsequent to or contemporaneous with the protected activity; and (3) there is a causal connection between her participation in the protected activity and the adverse employment action. Fasold, 409 F.3d at 199. The Court will focus solely on the adverse employment action requirement because all four claims fail on that issue. The Court reserves judgment on the remaining requirements for Counts I, II, V, and VI.

Once the plaintiff has established a prima facie case, the burden shifts to the defendant, who must provide a legitimate, non-discriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802-03; Burdine, 450 U.S. at 253; St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07.  Once the defendant has established a legitimate, non-discriminatory reason for the adverse employment decision, the burden shifts back to the plaintiff to show that the defendant's reason is pretextual.  McDonnell Douglas, 411 U.S. at 804-05.

UPS argues that Henderson cannot satisfy the adverse employment action requirement of the respective prima facie cases.[3]  Henderson claims that Gaines' comments that she was committing "career suicide" by reporting him constitutes an adverse employment action.  [See Docket No. 28, at 6.]  Even assuming that Gaines made that comment, a fact which the parties dispute, it does not constitute an adverse employment action for either her retaliation claim or her gender discrimination claim.

The standard for what constitutes an adverse employment action is different for retaliation and gender discrimination claims.  Indeed, "[t]he standard a plaintiff must meet in

---

[3] Plaintiff did not respond to UPS's arguments about her disparate treatment gender discrimination claims.  [See Docket No. 29-1.]  This means that the claims are effectively waived. See Ray v. Pinnacle Health Hosps., Inc., 416 F. App'x 157, 162 (3d Cir. 2010).  The Court will nevertheless analyze the claims under the relevant law.

establishing a materially adverse action is widely recognized to be 'lower for a retaliation claim than for a disparate treatment claim.'" McKinnon v. Gonzales, 642 F. Supp. 2d 410, 426 (D.N.J. 2009) (Simandle, J.) (quoting Flynn v. N.Y. State Div. of Parole, 620 F. Supp. 2d 463, 490 (S.D.N.Y. 2009)).  Therefore, if the "career suicide" comment is insufficient to constitute an adverse employment action for Ms. Henderson's retaliation claim, the same must be true for her gender discrimination claim.  See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64-67 (2006) (distinguishing the discrimination and retaliation provisions of Title VII and holding that the retaliation provision, unlike the discrimination provision, "is not limited to discriminatory actions that affect the terms and conditions of employment," but rather "extends beyond workplace-related or employment-related retaliatory acts and harm").

To satisfy the adverse employment action prong of the Title VII retaliation claim, Ms. Henderson "must show that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Moore v. City of Phila., 461 F.3d 331, 342 (3d Cir. 2006) (quoting Burlington N., 548 U.S. at 57).  As the Supreme Court put it, Title VII's "antiretaliation provision protects an individual not from all retaliation, but from

17

retaliation that produces an injury or harm." Burlington N.,
548 U.S. at 67.

Henderson cites only one case in support of her argument
that Mr. Gaines' alleged "career suicide" comment constitutes an
adverse employment action: Rivera v. Rochester Genesee Reg'l
Transp. Auth., 702 F.3d 685 (2d Cir. 2012). [See Docket No. 28,
at 6.]  In that Second Circuit case, the Court determined that
summary judgment was inappropriate given the totality of the
circumstances in the case. Rivera, 702 F.3d at 700.  In
particular, the Court relied on three facts.  Id.  First of all,
a supervisor in Rivera had made a threatening comment to the
plaintiff specifically suggesting that the plaintiff would lose
his job if he filed an EEOC charge.  Id.  Second of all, the
Court relied on evidence that showed that the supervisor had
responded to the plaintiff's complaints about his co-workers'
use of racial slurs by telling him to "suck it up and get over
it, n****r!"  Id.  Finally, the Court relied on the fact that,
after the plaintiff filed his EEOC charge, another supervisor
"arranged a meeting during which she admonished" the plaintiff.
Id.

Similar circumstances are not present here.  First of all,
Henderson points only to one instance of alleged retaliation:
Gaines' alleged "career suicide" comment.  Additionally, rather
than suffering any further adverse employment actions, such as

18

the admonishment that the plaintiff in Rivera received,
Henderson received a promotion and raise virtually immediately
after she complained about the alleged retaliation.  In other
words, this alleged retaliation did not produce any injury or
harm, as required by Burlington Northern.  Such a holding is
consistent with other cases in this Circuit.  See, e.g.,
Sconfienza v. Verizon Pa. Inc., 307 F. App'x 619, 621-22 (3d
Cir. 2008) ("[F]ormal reprimands that result in a notation in an
employee's personnel file could be sufficiently concrete, but
harsh words that lack real consequences are not." (quoting
Robinson v. City of Pittsburgh, 120 F.3d 1286, 1298 (3d Cir.
1997))); Hudson v. Cheyney Univ. of Pa., Civil Action No. 14-
2552, 2018 WL 6603870, at *7 (E.D. Pa. Dec. 14, 2018) ("[T]he
threat of termination . . . does not amount to an adverse
employment action because no punitive action was taken against
plaintiff . . . ."); Leblanc v. Hill Sch., Civil Action No. 14-
1674, 2015 WL 144135, at *16 (E.D. Pa. Jan. 12, 2015) ("[W]hen
an employer threatens to take an action but does not in fact
take that action, the threat does not constitute a materially
adverse employment action for the purposes of retaliation
claims."); Ilori v. Carnegie Mellon Univ, 742 F. Supp. 2d 734,
760 (W.D. Pa. 2010) (holding that a "threat [that] was never
carried out and had no demonstrable impact on plaintiff's
employment" is insufficient to constitute an adverse employment

action); see also Hellman v. Weisberg, 360 F. App'x 776, 779 (9th Cir. 2009) (holding that a threat of termination and criminal prosecution did not constitute an adverse employment action when the plaintiff was never fired or prosecuted).

In sum, Gaines' comment to Henderson that she was committing "career suicide" by reporting him does not constitute an adverse employment action for the purposes of a Title VII retaliation claim. Since the standard is stricter for a Title VII gender discrimination claim, the "career suicide" comment is also insufficient to constitute an adverse employment action for that claim. Therefore, Henderson is unable to establish a prima facie claim for both her retaliation and gender discrimination claims under Title VII. Finally, since the analyses for both of those claims are the same under Title VII as under the NJLAD, Henderson also fails to establish prima facie claims under the NJLAD. As a result, the Court will grant summary judgment in favor of UPS on each of Counts I, II, V, and VI.

**B.   Hostile Work Environment**

Henderson also fails to satisfy the prima facie case for a hostile work environment sexual harassment claim under both Title VII and the NJLAD. In order to succeed on a hostile work environment claim under either statute, a plaintiff must establish that: (1) she suffered intentional discrimination because of her sex, (2) the discrimination was severe or

pervasive, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) respondeat superior liability exists.  Mandel v. M&Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013) (Title VII); Lehmann v. Toys 'R' Us, 626 A.2d 445, 452 (N.J. 1993) ("In construing the terms of the [NJ]LAD, this Court has frequently looked to federal precedent governing Title VII . . . .").

UPS argues that Henderson fails to satisfy at least the second and fifth prongs.  Henderson argues that the events outlined above do constitute "severe or pervasive" discrimination.[4]  "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'"  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (quoting Henson v. Dundee, 682 F.2d 897, 904 (11th Cir. 1982)).  A court should consider four factors in determining whether that standard is met: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

---

[4] As above, Henderson failed to respond to UPS's argument about the fifth prong.  [See Docket No. 28, at 3-5.]  This means that the argument is effectively waived.  See Pinnacle Health, 416 F. App'x at 162.  Because the Court will rest its decision on the second prong, it will not address the fifth prong.

whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

Here, Henderson argues that five events constituted severe or pervasive discrimination: (1) Gaines' comment that he thought she was bisexual; (2) Gaines' comment, "I would consider both of us attractive people, wouldn't you say?"; (3) the incident in which Gaines made a gesture by "pump[ing] his hand in front of me and Steve" when he had "his hands by his penis area, groin area"; (4) Gaines' comment that Henderson was committing career suicide by reporting him; and (5) Gaines' car being parked near Henderson's car on twelve occasions over the course of two months.  [See Docket No. 28, at 4.]

The Court does not take lightly these allegations, and in no way condones the alleged actions of Gaines.  But the bar in Title VII cases is a high one, and for good reason: "to ensure that Title VII does not become a 'general civility code.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Unfortunately for Henderson, as a matter of law, the facts of this case, even when considered in the light most favorable to Plaintiff, do not meet that high bar.

Within the parameters set forth by precedent in this Circuit, the allegations in this case were not frequent, since Henderson only alleges five incidents over the course of at

least 26 months.  They were not severe, as they amounted to
nothing more than "[t]he mere utterance of an epithet, joke, or
inappropriate taunt that . . . cause[d] offense."  Brown-
Baumbach v. B&B Auto, Inc., 437 F. App'x 129, 133 (3d Cir. 2011)
(holding that "not every sexual comment, action, or joke creates
a hostile work environment" and that "[t]he mere utterance of an
epithet, joke, or inappropriate taunt that may cause offense
does not sufficiently affect the conditions of employment to
implicate Title VII liability").  They were not physically
threatening or humiliating, but rather merely offensive
utterances, since Henderson herself admits that Gaines never
physically touched her.  Finally, they did not unreasonably
interfere with Henderson's work performance, which again
Henderson admits.

     There can be no question that, if Henderson's allegations
are true, certain aspects of Gaines' behavior were at best
socially unacceptable.  But there can also be no question that
these allegations are insufficient to meet the high burden of
severe or pervasive harassment required for a successful hostile
work environment sex discrimination claim under Title VII and
the NJLAD.  Such a holding comports with the overwhelming
majority of cases in this Circuit.  See, e.g., Bacone v. Phila.
Hous. Auth., 112 F. App'x 127, 129 (3d Cir. 2004) ("The behavior
at issue involved no more than four incidents during the span of

two weeks, and though they were offensive, they are not pervasive enough to rise to the level of a Title VII violation."); Saidu-Kamara v. Parkway Corp., 155 F. Supp. 2d 436, 439-440 (E.D. Pa. 2001) (defendant, over 18-month span, touching plaintiff's breast; propositioning her for sex; offering her money to go out with him; removing a bottle of wine from his pants, asking her to join him later at a local hotel for a "good time," and again touching her breasts and buttocks insufficient); Bonora v. UGI Utilities, Inc., No. CIV.A. 99-5539, 2000 WL 1539077, at *4 (E.D. Pa. Oct. 18, 2000) (defendant touching plaintiff's hand, brushing his buttocks against hers, and touching her waist insufficient); McGraw v. Wyeth-Ayerst Lab., Inc., No. CIV. A. 96-5780, 1997 WL 799437, at *6 (E.D. Pa. Dec. 30, 1997) (defendant kissing plaintiff, touching her face, asking her out on dates, inquiring about her marriage insufficient).

Because Henderson has failed to establish that the alleged harassment she experienced was severe or pervasive enough "to alter the conditions of [her] employment and create an abusive working environment," the Court must grant summary judgment in favor of UPS as to Counts III and IV.

## CONCLUSION

For the foregoing reasons, the Court will grant UPS's

Motion for Summary Judgment as to all of Plaintiff's claims.  An

accompanying Order will be entered.

April 27, 2020_____       s/Noel L. Hillman_____
DATE                                      NOEL L. HILLMAN, U.S.D.J.
At Camden, New Jersey